The next case on the calendar for today is No. 22-918, Global Energy Trading v. ING. Thanks. Mr. Belknap, whenever you're ready. Thank you, Your Honor. May it please the Court, my name is Tom Belknap from Blank Rome, representing the Atalantans matter. This is essentially a sale of goods case, and it's governed by Singapore law. That's not an issue that's disputed in the appeal. It involves a seller, which is the appellant, a buyer, which is O. W. Bunker, who has assigned their claim to ING, and then a sub-buyer, who is the vessel interest, Fujian. Both the sale and the sub-sale were subject to retention of title terms, which meant that each the seller and the buyer who onsold the goods reserved title in the goods subject to pending payment. There's no contract between your client and the owner of the vessel, right? That's correct, Your Honor. And there's no document delivered to the owner of the vessel at the time of the delivery of the goods, right? Well, there is a bunker delivery note that's delivered to them that confirms- But the bunker delivery note doesn't express any rights that your client has with regard to title of the bunkers- It does not express the retention of title. At the time of the delivery of the bunkers, right? It does not contain that- So you're a stranger to the owner? Well, we are an owner of the bunkers that were delivered to them. I understand that, but you're a stranger to the owner, are you not? Contractually, yes. Okay. Yes. Singapore law is very clear under its Sale of Goods Act that it recognizes that a seller may sell goods to a buyer and retain title until they're paid. Singapore law also recognizes- But when you sold these goods, you sold these goods but you didn't expect to be paid up to 30 days. There was a term that allowed for payment in 30 days, but there was also, Your Honor- So you sold them to O.W. knowing that O.W. may not pay you for 30 days. That's true, Your Honor. So didn't you inherently know or represent that it might very well be that O.W. would immediately have them- You delivered the goods to Fujian. You expected Fujian to stay in port for 30 days and not use up the bunkers? Not at all, Your Honor. So you had to understand. You had to understand that the ship might sail, and indeed it did. Your Honor- Did it not? Your Honor, the ship did sail, but Your Honor- So was Fujian to- Couldn't Fujian- I mean, how could Fujian- Fujian didn't have anything to rely on. You made no representations to Fujian. Well, that's interesting, Your Honor, because the district court thought that we did. But in fact, I agree with you that we made no representations to them. Our terms and conditions contained a term which specifically allowed Global to accelerate the terms for payment. In the event, it became insecure about O.W. Bunker's financial ability, which happened when O.W.'s bank went bankrupt. It'd be an interesting result if the district court- I realize that the district court may have been misunderstood or when it said that it created on the reliance in its employment of the establishment. But you certainly had to have understood that the ship might sail and that your bunkers might be used up in transit. Yes, they did understand that that might happen. But they also had a provision that protected them that in the event that it became evident before that happened, that there was a concern and that they weren't going to be paid, that they were entitled to enforce their retention of title clause. They understood that there was a possibility- Should O.W. have told Fujian, in your view, that, well, be careful because if we don't pay, we'll still own the bunkers? Well, Fujian knew that that was a risk because they also entered into a contract with O.W. Bunker that also had a retention of title clause. This is not a case where they- Well, I don't know how that helps you. I don't know how that helps you at all because Fujian knows if it pays O.W. And so the fact that Fujian is in control of knowing whether it is or is not going to have expenses with regard to something that O.W. asserts with regard to title of the bunkers. But he has no idea as to you. Singapore law doesn't require Fujian to know. But what it says is that the parties are entitled to- It requires Fujian to know what the terms are between you and Gett? Or you and O.W.? No, it does not require them to know that. It doesn't. No, it certainly doesn't. No, and the point is, Your Honor, that Singapore law recognizes this exact situation. Seller, buyer, sub-buyer. There are cases. There's Highway Foods. There's Hanson. There's Foresight. These cases all support the proposition very, very clearly. In fact, this is a point that's acknowledged by ING in their papers. That the basic rule is that a sale from a buyer- Excuse me, a seller to a buyer to a sub-buyer, where both parties have a retention of title clause in them, that seller can enforce their title against the sub-buyer until the time that the sub-buyer pays the buyer. That is Singapore law. That's established. The issues that were raised on appeal are these other points. Whether a stop hold applies. And you already acknowledged, Your Honor, that in this case there was no representation- Your point is, as to OW at least, you should be able to assert a title claim ahead of the assignee, ING. That's true. Yes, Your Honor. Because they never had title to the goods. OW never had title to the goods. ING, as an assignee, could never take more than OW had. So OW never had the right to claim it for the price against Fujian. Because they didn't own the goods. Global owned the goods. And Fujian burned them after receiving notice that Fujian owned them and had not been paid for them, had retained title, and wanted to get the goods back. They burned it knowingly, and they converted it by consequence. Can you give me a little tremor, Your Honor? I'm not facile with international legal structures, and so this is a Singapore law case. Yes, Your Honor. This highway foods case, which strikes me as just smack on point, although your colleague will have an opportunity to tell me why it's not. It's not actually a Singapore case. Is that right? Correct, Your Honor. Can you talk to me about the relationship? What was the court that issued it?  Absolutely, Your Honor. Singapore law is its own country. It has its own body of law. Singapore law is derived directly from English law. Singapore courts routinely look to English law and other common law jurisdictions, including the United States, but primarily English, as very persuasive. I will not say controlling, but very persuasive law. And I believe this is actually, and I wish I could not point you to the record, but I believe our expert submission makes this point. But Singapore law very closely draws on English law as being— So where does this—who's the English court that issued the highway foods decision, and where does it fit in the—is it a municipal district court, or is it a high appeals court? It's not a high appeals court. I don't remember exactly the court, but it is a court of first instance, I believe, Your Honor. And I agree with you, Your Honor, that it is directly on point. And that case draws on two other sources. One is the Benjamin sale of goods, which is a treatise, and also the case Hansen. And those both are also directly on point, Your Honor. Forsyth, which is another case, is also on point. And I think there's a really important point that maybe didn't get highlighted in the briefs that comes out of that case, which is that, you know, a lot of it was made by the lower court, the fact that these bunkers were commingled. But in the Forsyth case, it also involved bunkers and also involved commingled bunkers. And that was not a problem to the court. As I read Forsyth, the court didn't actually sort of adjudicate that issue so much as acknowledge that the parties agreed that the title didn't pass. I acknowledge that. You're right, Your Honor. I see I've exceeded my time. I'm happy to answer more questions or I'll reserve the rest of my time if I could. Thank you. Thank you, Your Honor. Thank you, Mr. Bellamy. Mr. Paulson. Good morning, members of the panel. Thank you. Bruce Paulson for ING Bank, the assignee of the rights of OW Far East in this case. Like many physical suppliers of bunkers in these cases globally, which have been going on for almost nine years, Global GATT is looking to avoid the consequences of having done business with a bankrupt entity by bringing a conversion claim in the Fosco Interpreter Action. We've seen a lot of these claims over time. Some of them have been up here. Have there been any other claims in which a party is relying on the retention of title claim? In other words, I understand this is similar in sort of broad nature, but have we seen this issue before? There have been a number of retention of title claims. None of them have succeeded. Have they been litigated? They have been litigated. My recollection, I don't recall exactly where they all came out. The Tamara case was before this court where the court found there was no conversion because the use of the bunkers was authorized. And, you know, that is what Judge Caproni focused on in her decision. And let me just take issue at first with Mr. Belknap's comment that you can't take more than OW had. You know, there's a lot of depth in these Singaporean and English cases about what's a sale, what's an agreement to sell, Section 25, Section 9, Section 17, all the issues that are addressed in depth by the Singaporean legal experts. But the fact is, to have a claimant conversion, you need a right of immediate possession. And our client has that even under Highway Foods. Now, Highway Foods, which we don't think is smack on point, is a case where basically the sub-purchaser and the original seller cut out the middleman and negotiated a repossession package. And if, well, I'm going to page 8576 of the record, Mr. Liu's first declaration, saying where, however, the sale by S to B on retention of title terms and the sub-sale by B to T is likewise on retention of title terms, that's Highway Foods. Prior to paying... In this case as well, right? What's that? That's Highway Foods, but it's also this case, that the retention of title... That's right. ...for both seller and sub-seller. Right, although to the point of when Mr. Belknap was arguing, Fujian had no knowledge of the GET, retention of title clause. Before you go, I want to address that. To the extent that the contract between Fujian and O.W. Bunker incorporated by reference the terms and conditions of any third-party seller, local seller that they relied on, is it your position that that provision is not enforceable, that we can't give it effect? They took without knowledge. So is it your position that that's... Yes. They took without knowledge that that was one of the terms and conditions of O.W. Bunker? No, that that was a GET requirement. But they were on notice that whatever GET's requirements were applied to them. They just didn't inquire as to what GET's requirements were. GET's requirements did not apply to Fujian. Right. So to the extent that the contract between O.W. Bunker and Fujian incorporated by reference, they say you take it subject to the terms and conditions of any local sub-seller that we work with. You're saying that provision in the contract between O.W. Bunker and Fujian had no effect? It's not valid? Just to take a step back, GET argues in its paper that Clause L4 of the O.W. terms and conditions, and again, a number of physical suppliers throughout these cases over the last nine years have made this argument never with success except for a case in Canada called Campitex, argue that under L4 the terms and conditions of the seller, in this case GET, would apply to the sub-purchaser if the seller, quote, insists that those terms so apply. But the record is devoid of insistence, and therefore those terms do not apply. Okay, but was there something in the contract between O.W. Was the provision, the L4 provision you just cited, was that in the contract between O.W. Bunker and Fujian, or was that in the contract between Global and O.W. Bunker or both? L4 is part of the O.W. terms and conditions. Okay. Thank you. Quickly going back to Highway Foods, where both the sale and the sub-sale on a retention of title terms, as a result, prior to payment of the price, the sub-purchaser does not obtain good title. That's Highway Foods, as I was saying before. But as Mr. Lewd continues, nonetheless, by operation of Sections 9 of the Factors Act and Section 25 of the Sales of Goods Act, the sub-purchaser acquires an immediate right of possession to the goods because he acquires the right to obtain title by tendering the price, citing authority. So it's FOSCO, Fujian, that has the immediate right of possession of goods. That is what is required for a conversion claim. But isn't the argument— Yet does not have that right, and therefore does not have a right in conversion. Isn't the argument that because of the retention of title position, once it asserts its retention of title, that's when Fujian loses its right of immediate possession? In other words, it may well be that in the absence of such an assertion, everything unfolds as it usually does. But it's the assertion—and had they burned the fuel, I don't understand them to be arguing that had they burned the fuel before the demand, that they would have been subject to liability for conversion. I understand it to be that because the demand was made before the fuel was burned, and there's all sorts of reasons why that may not actually be true. I think it's quite unclear from the record. Fair enough. The fuel was commingled. There was a little more left than was originally there by the time that notice was served on November 10th of 2014. But in theory, I guess I'm trying to figure out whether you see—is Highway Foods rightly decided? I guess maybe that's a question I have for you. I'm sorry, I didn't— Was Highway Foods rightly decided on its own terms? No, I don't think Highway Foods was rightly decided. I don't think—in fact, ING cited it in the first instance in the portion that I just read in support of their argument as another way to get to the result that Judge Caproni reached. So, no, we don't think there's any problem with Highway Foods. It is a fairly obscure lower court decision. The Forsyth case, although it involves bunkering, it's about how you divvy up bunkers on the redelivery of a vessel and an alternate on the termination of the charter and not anything to do with the sales and sub-sales of the charter. So it is off point, as is Hansen. Judge Caproni got it right in that get as equitably as stopped from revoking its consent to consume the bunkers. That test was clearly met. The three elements of the equitable estoppel test under Singapore law. Judge Caproni also found that precious shipping was in some way, shape, or form off point. Can I ask you, how does Fujian rely upon GET's representation that the money's due in 30 days if Fujian doesn't get a document from GET to that extent? I don't know how. So then how does Judge Caproni do her evaluation of estoppel based upon what Fujian is doing with regard to GET's representations? I don't understand the question. The way Judge Caproni says, she says, look, GET says we're delivering the goods  And then she says, Fujian, knowing that it's not due until 30 days, relies upon that and GET knows then that the ship may sail. But if there's no document that runs from or representation that runs from GET to Fujian, how is there anything to rely on? The representation, according to Judge Caproni, was the delivery on credit terms. And at the delivery time, I see what you're saying. The simple fact that it's delivered and not delivered and payments required immediately. Absolutely. This wasn't cash on delivery. It was on credit terms. Over the years, we've gotten to know in these cases that bunkers flow on credit. 30 days generally throughout and up and down these chains. OW's bankruptcy has made a lot of work for the Second Circuit and especially for Judge Caproni in the Southern District. This is the last one, Your Honor. Just so I understand, so your position is that the retention of title clause could only be affected prior to as long as there's the ability to repossess. Once that ability is lost, then the retention of title clause is meaningless. Well, here upon delivery, there was the implied consent that they could begin consuming immediately. They then sought to revoke that consent down the road. That's what the court found to be inequitable. If we agreed with Caproni's estoppel argument, though, we don't have to deal with the retention of title issue, do we? That's correct. All right. But in figuring out whether or not there's reasonable reliance on the notion that delivery amounts to irrevocable consent to consume because the payment is delayed, do we ignore the retention of title provision in evaluating the reasonableness of that inference? One, I think pressure shipping is correct. Two, I think there were all the elements of equitable estoppel, the act or omission in reliance on that representation made by delivery involved burning the bunkers and not segregating the bunkers, led to detriment. The equitable estoppel argument works. This case is also controlled by pressure shipping, which is right on point. Can I ask a question about the implications of Judge Caproni's alternate analysis, which is that, as I understand it, sort of along the lines of the Mitsubishi case, even though the operative language in the agreement wasn't actually there, but the notion that, well, what the effect of that retention of title provision really is, is that once O.W. Bunker sells it to Fujian, the right that Get retains is not a right to the property itself, but is essentially a property interest in the money that is owed to O.W. Bunker for that. If that's true, then don't they win the interpleader? Maybe it's not because it was a conversion claim, but if the law is that and the agreements are that they have a property interest in the money that is now sitting there in court waiting to find out where it goes, doesn't that resolve the case? No, it means they should have made a claim in the bankruptcy of O.W. Far East in Singapore, not here. Judge Caproni correctly decided that ING gets the in rem maritime lien claim and its in personam claim and it wins the interpleader. Thank you. Thank you. Thank you, Your Honor. I'd like to take that last point first, because I think Your Honor hits the nail on the head, and I don't understand how it would be that a claim in the O.W. bankruptcy would be the right remedy when, if Judge Caproni is right that the property interest transferred from the goods to the funds, the funds were deposited in the court in New York. So our position has always been that that is not what the intent or meaning or even with the plain language of that. If their interest is in O.W.'s money, then you've got a claim against O.W.'s estate. Our interest is in the property, the property, the bunkers that were on board. That is the interest we own. We own the bunkers. If the interpretation of that clause is that my title transferred from the bunkers to the funds, then we own the funds. Does the answer really turn on whether what you got was a security interest in the funds versus title to the funds? Maybe it does, Your Honor. But, I mean, where does that even come from? Because even Judge Caproni acknowledged that the plain language of the retention of title clause was that you retain title in the property. And this case is a perfect example of why that's exactly what Global wanted to do, because they knew that there might be a scenario where they become insecure, the bunkers haven't been burned yet. It takes a long time to burn bunkers. They don't necessarily consume bunkers in 30 days. So it's not unreasonable to expect that there would be bunkers left at the end of the payment term. In this case, it happened to come earlier, and almost all or possibly all of the bunkers had not been consumed. Now, on that point, Your Honor, I think this commingling is something that Judge Caproni really got caught up in, but it's something that is easily dealt with under Singapore law, the cases we cite in our papers, that the court very clearly knows how to allocate. You know, it's not hard, based on what information is in the record, to determine a rateable amount of this fungible commodity that was in the tanks and determine what portion of that should be allocated to Global. There are a couple of other points I wanted to address that just were raised by Mr. Paulson in his papers, excuse me, in his argument. There is no reported decision in the U.S. or elsewhere that I know of that addresses this retention of title issue. Certainly, there's no U.S. case that's been cited in anybody's papers. So this is a case of first impression. This is not like every other one, including all the ones that have come before this Court before. And the other point that I think is just really important I need to reiterate. Knowledge is not a criteria under this retention of title issue. It is not relevant whether Fujian knew about what Global's interest is. The cases that we cite are very clear on that. They do not consider that. That is not a factor. That is not anything that is relevant to this question. So, Your Honor, you've asked a number of times, what did Fujian knew? No. The fact of the matter is that they knew that they were buying it on retention of title terms from their sellers. They didn't own it. And the rest of it is not important as to what they knew. Well, but they also knew that payment wasn't due on delivery. That's true, Your Honor. And they knew that they were entitled to- The result of that was because of your terms with O.W. Well, maybe- Right? Am I right? No, I don't think that's correct. No? Because my terms with O.W. is irrelevant. What were the terms of delivery that you had with O.W.? Let me finish. Please. I apologize. I'm going to beg the Senate Chair to let you answer the question, okay? What were the terms of delivery that you had with O.W.? It was on a payment term of 30 days, Your Honor. 30 days? Yes, Your Honor. Could a ship have sailed and burned all of your bunkers in 30 days? It's possible, Your Honor. Thank you. And just to follow up on that, if that had happened, I take it your position sort of a la Highway Foods is that for the portion of the fuel that was burned, your client's interest is essentially either the property interest or the money paid for that, and for the portion that remained unburned, that's where your property interest persists. Is that- That's exactly right, Your Honor. We are not claiming conversion for any portion of the bunkers that were already consumed. Fair enough. Thank you, Your Honor. Thank you, counsel. Thank you both. Thank you. Thank you.    Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.